**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTOINETTE A. BAYLETS-** | : | |
| **HOLSINGER,** *pro se* | : | **Civil No. 4:18-CV-60** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **THE PENNSYLVANIA** | : | |
| **STATE UNIVERSITY,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

This is a civil action brought by the *pro se* plaintiff, Antoinette Baylets-Holsinger, against her former employer, The Pennsylvania State University ("Penn State"). In her Second Amended Complaint, Baylets-Holsinger alleges that she was discriminated against because of her gender, subjected to a hostile work environment, and retaliated against when she reported the discrimination in violation of Title VII of the Civil Rights Act of 1964.[1] Penn State now moves for summary judgment on the plaintiff's claims, arguing that Baylets-Holsinger has failed to

---

[1] Baylets-Holsinger's Second Amended Complaint also alleged retaliation for whistleblowing. This claim was dismissed by the Court on May 7, 2019. (Docs. 35, 36).

identify any issues of material fact with respect to her Title VII claims. For the reasons set forth below, we agree, and we will grant the defendant's motion for summary judgment.

## II.   <u>BACKGROUND</u>

The factual background of the instant case has been aptly summarized in our prior filings in this case. In short, Antoinette Baylets-Holsinger was employed by Penn State as a senior-level Contract Coordinator and Licensing Administrator in the IT Department from August 1990 to January 2017. (Doc. 28, ¶ 1). In August of 2015, she met with Senior Director Martin to discuss issues with her workplace climate, which allegedly included an inequitable balance of workload between male and female employees, being overlooked for promotional opportunities, and inappropriate sexual behavior by a male coworker. (<u>Id.</u>, ¶¶ 1, 4). One week later, at Martin's direction, she had a meeting with representatives from the Human Resources department to discuss these concerns. (<u>Id.</u>, ¶ 5). In November of 2015, some three months after she raised these concerns, Baylets-Holsinger contends that she was then put on a Performance Improvement Plan (PIP) by her immediate supervisor, Susan Taylor, action which Baylets-Holsinger believed to be caused by her report of workplace concerns. (<u>Id.</u>, ¶¶ 7, 8). Notably, nothing beyond her subjective impression of discrimination connects these disparate events, and substantial uncontradicted evidence refutes this causal inference.

2

During the PIP process, Baylets-Holsinger had several progress meetings with Taylor and Deb Johnson, a Human Resources representative. (Doc. 63, at 75-77). The notes from these meetings indicate that Taylor's issues with Baylets-Holsinger included her excessive tardiness and her inability to meet project deadlines. (Id., at 75). Baylets-Holsinger expressed that she believed her contract administration workload was more than that of her coworkers; however, it was noted that one of her male coworkers, with whom Baylets-Holsinger had compared her workload, had other responsibilities than solely performing contract administration. (Id., at 75-76). After a November 23, 2015 meeting, Taylor noted that "Toni is not willing to accept personal responsibility for any of her deficiencies. Spending lots of time deflecting attention and blaming others." (Id., at 76). Similarly, following a progress meeting on December 15, 2015, while it was noted that Baylets-Holsinger had been arriving to work on time, meeting notes indicate that Baylets-Holsinger still was not accepting responsibility for her inadequate job performance and that she thought she was performing her job well. (Id., at 77).

Baylets-Holsinger asserts that she did not receive updates on her PIP from December 2015 until her annual evaluation in June 2016. The evaluation was completed by Taylor, who indicated that she was disappointed that the PIP process did not result in improvements in Baylets-Holsinger's work performance. (Id., at 78). Specifically, she noted Baylets-Holsinger's "lack of commitment and continued

3

failure to meet the required expectations." (Id.) Then in July of 2016, Baylets-Holsinger was informed that she was being placed in a formal HR-78 process. Indeed, on July 8, 2016, Baylets-Holsinger received a letter from Susan Taylor, which outlined the reasons that Baylets-Holsinger was being placed in the HR-78 process. (Id., at 92). Among these reasons were issues with Baylets-Holsinger's contract management, which led to income deficits for the university; poor preparation for audit meetings; poor time management and tardiness; and inability to work independently on projects. (Id., at 93-94). In addition, the letter specifically recognized Baylets-Holsinger's lack of self-awareness regarding her performance deficiencies and noted that she continually blamed others for her mistakes. (Id., at 94). For her part, Baylets-Holsinger believes that the HR-78 was initiated in retaliation for her reporting a one million dollar overspend in May 2016, rather than because of her work performance.

Baylets-Holsinger and Taylor continued to have bi-weekly meetings in July, August, and September of 2016 to discuss her progress during the HR-78 process. (Id., at 92, 95, 99, 101, 103, 105, 107, 112, 117). After each meeting, Taylor memorialized the meeting in a letter to Baylets-Holsinger, and these letters consistently indicated that Baylets-Holsinger's performance was not improving, particularly the subject areas of contract management, time management, and administration. (Id.) Baylets-Holsinger disagreed with the overall evaluation of her

work performance, and in mid-September 2016, she took FMLA leave for what she described as work-related PTSD, stress, and anxiety. (Doc. 66, at 3). She also filed a complaint with the EEOC dated October 10, 2016, describing the issues she was having at work and asserting that she had been facing discriminatory and retaliatory actions from her supervisor, Susan Taylor. (Doc. 63, at 162).

On October 19, 2016, while she was out on FMLA leave, Baylets-Holsinger contacted the University President and the Vice President of Human Resources, requesting intervention with her situation at work. (Id., at 119). In her letter, Baylets-Holsinger asserts that she had been retaliated against on two separate occasions, and that she had endured "health-harming discriminatory bullying and retaliation actions." (Id.) She provided a timeline of the alleged retaliatory events, *i.e.* her PIP process and HR-78, and requested that these officials intervene, as she was about to enter "no pay" status. (Id., at 123). She then had a meeting with two individuals, Susan Morse and Kari Allatt, on November 11, 2016, wherein Baylets-Holsinger was presented with three options for her return to work: accept a three-level lower position while maintaining her current salary, and the HR-78 would be closed; returning to her current position and the HR-78 would be closed; or voluntary resignation/retirement with two months of severance pay. (Id., at 128).

Dissatisfied with these three options, and after an email exchange discussing these options, Baylets-Holsinger opted to resign her position with Penn State in a

letter dated December 22, 2016. (Id., at 50). Around the same time as her resignation, Baylets-Holsinger received an offer of employment from Bucknell University on December 16, 2016, which she subsequently accepted. (Id., at 64).

Baylets-Holsinger filed the instant action January 9, 2018. (Doc. 1). She then filed two amended complaints, the latter being the operative complaint in this case. (Docs. 20, 28). After a series of motions to dismiss and amendments to the plaintiff's complaint, this court dismissed Baylets-Holsinger's claims brought under the Americans with Disabilities Act, the Family and Medical Leave Act, and the Pennsylvania Whistleblower Law. (Docs. 26, 27, 35, 36). Thus, the only remaining claims in this case are Baylets-Holsinger's claims of discrimination and retaliation brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* The defendants filed the current motion for summary judgment on April 29, 2020 (Doc. 61), and the motion is fully brief and is ripe for resolution. (Docs. 64, 66, 69).

After careful consideration, we find that there are no genuine disputes of material facts from which a reasonable juror could find in favor of the plaintiff. Accordingly, for the following reasons, we will grant the defendant's motion for summary judgment.

## III.   <u>STANDARD OF REVIEW</u>

The defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, a court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law." Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). A disputed issue is only "genuine" if there is a sufficient evidentiary basis upon which a reasonable factfinder could find for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A factual dispute is "material" only if it could affect the outcome of the suit under the governing law. Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York Papers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)). The Court is not tasked with resolving disputed issues of fact, but only with determining whether there exist any factual issues that must be tried. Anderson, 477 U.S. at 247-49.

In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Macfarlan, 675 F.3d at 271; Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009).  Where there exist factual issues that cannot be resolved without a credibility determination,

7

the court must credit the non-moving party's evidence over that presented by the moving party. Liberty Lobby, 477 U.S. at 255. However, if there is no factual issue presented, and if only one reasonable conclusion could arise from the record with respect to the potential outcome under the governing law, the court must award summary judgment in favor of the moving party. Id. at 250.

The court must review the entire record, but in doing so must take care to "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 150-51 (2000). The task for the court is to examine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52. In considering this evidence, we note that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment." Paladino v. Newsome, 885 F.3d 203, 209 n. 34 (3d Cir. 2018) (quoting Lupyan v. Corinthian Colleges, Inc., 761 F.3d 314, 320 (3d Cir. 2014)). This principle of the rules governing summary judgment holds true "even where . . . the information is self-serving." Id. (citing Lupyan, 761 F.3d at 321 n.2).

## IV.   **DISCUSSION**

In this case, the plaintiff brings claims of discrimination and retaliation in violation of Title VII. She asserts that she was discriminated against because of her gender, subjected to a hostile work environment, and retaliated against when she reported the discriminatory and harassing behavior. However, our review of the record demonstrates that there are no genuine issues of material fact that would preclude summary judgment in favor of the defendant on all of the plaintiff's claims. Rather, the record indicates that over a one year period Baylets-Holsinger underwent the PIP and HR-78 processes because her supervisor had issues with her work performance and lack of improvement, not because of her gender or her reports of allegedly discriminatory behavior. Accordingly, we will grant the defendant's motion for summary judgment.

### A.   **The Plaintiff's Title VII Discrimination Claim Fails on its Merits.**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against and/or discharging their employees because of their sex. 42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are governed by a familiar burden-shifting framework. See Jones v. Southeastern Pa. Transp. Auth., 796 F.3d 323, 325-26 (3d Cir. 2015). In brief, that framework requires that the plaintiff demonstrate that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) under circumstances that give rise to an inference of

unlawful sex-based discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). The last element also requires that the plaintiff demonstrate a causal connection between her protected status and the allegedly adverse action. Id. at 798. The key focus of the *prima facie* test is "always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Id. (citation omitted). The elements of the *prima facie* case "must not be applied woodenly but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." Geraci v. Moody-Tottrup Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996).

In addition, " 'a plaintiff may establish that an employer has violated Title VII by proving that discrimination based on sex created a hostile or abusive work environment.' " Jones, 796 F.3d at 328 (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)). In order to do so, a plaintiff must make a *prima facie* showing that: "(1) she suffered intentional discrimination because of her sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability." Bumbarger v. New Enterprise Stone and Lime Co., Inc., 170 F.Supp.3d 801, 826 (E.D. Pa. 2016) (quoting Martinez v. Rapidigm, Inc., 290 F. App'x 521, 524 (3d Cir. 2008) (internal quotation marks omitted)).

Title VII claims are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hare v. Potter, 220 F. App'x 120, 127 (3d Cir. 2007). If the employee establishes a *prima facie* case of discrimination, the burden shifts to the employer to advance a legitimate, non-discriminatory reason for its conduct, and if the employer does so "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that [discrimination] . . . was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)).

Judged against this analytical paradigm, we find that Baylets-Holsinger has not set forth a *prima facie* case of gender discrimination or a hostile work environment. The plaintiff asserts that she was given a heavier workload and scrutinized more closely than her male coworkers, and that she was placed on a PIP even though her performance was not lacking.

This claim fails on several scores. At the outset, we note that the Third Circuit has stated that placement on a PIP, without more, does not constitute an adverse employment action. Reynolds v. Dep't of Army, 439 F. App'x 150, 153 (3d Cir. 2011) (non-precedential). The Court found that because the plaintiff's placement on a PIP was not accompanied by "an adverse change in the conditions of his employment," it could not be considered an adverse action by his employer. Id. The

11

Court reasoned that "PIPs are typically comprised of directives relating to an employee's preexisting responsibilities," and thus are "far from . . . a change in employment status." Id. Courts in this circuit have followed this reasoning, holding that a placement on a PIP, without some change in employment status, cannot satisfy an adverse employment action in this context. See e.g., Nicholson v. Petco Animal Supplies Stores, Inc., 409 F.Supp.3d 323, 332 (M.D. Pa. 2019) (holding that the plaintiff's placement on a PIP did not constitute an adverse action "primarily because the warning was not accompanied by any materially adverse effect on Nicholson's compensation, terms, conditions, or privileges of employment"); Russell v. FedEx Ground, 2019 WL 1277514, at *9 (D.N.J. March 20, 2019) (finding no adverse employment action where employee was placed on a PIP).

In the instant case, we cannot conclude that Baylets-Holsinger's placement on a PIP, standing alone, constituted an adverse employment action. The plaintiff provides no evidence that being placed on a PIP changed the conditions of her employment, benefits, or compensation. In fact, the plaintiff conceded in her deposition that her salary remained unchanged throughout the PIP process. (Doc. 63, at 25). In addition, given that the plaintiff's concern going into the PIP was her workload, it is undisputed that her supervisor Taylor attempted to ameliorate this concern by redistributing some of Baylets-Holsinger's contracts to another employee to offset her workload. (Id., at 76). This effort to address the concern raised

by the plaintiff simply cannot be seen as evidence of discrimination. Further, the conditions of her employment, her salary, and her responsibilities remained unchanged. Accordingly, we cannot conclude that the placement on a PIP constituted an adverse employment action.

Moreover, even if we found that Baylets-Holsinger suffered some potentially adverse employment action, there is no evidence that  gives rise to an inference of discrimination because of her gender. Baylets-Holsinger attempts to set forth incidents in which male colleagues either received a lesser workload than she had, or received a promotional opportunity that she applied for, to show that she was discriminated against because of her gender. (Doc. 28, ¶ 3; Doc. 66, at 5). However, she provides no evidence from which we could infer that these incidents were the result of discriminatory animus toward her because she is a female. To the contrary, the defendant has provided the job descriptions for both Baylets-Holsinger and the male coworker that she claims had a lesser workload, from which it is evident that the positions require different skills, duties and responsibilities. (Doc. 66, at 51, 153). For example, forty-five percent of Baylets-Holsinger's position required her to review, evaluate, implement, administer and manage larger and more complex licensing contracts, whereas her coworker's position required about thirty percent of reviewing, evaluating, implementing and managing assigned license contracts. (Id.) Thus, her contention that she was receiving a heavier workload than this male

coworker because she is female is belied by the fact that this was simply part of her job responsibility as a senior-level contract coordinator to perform these functions. Further, Baylets-Holsinger provides no evidence of any other disparate treatment between herself and her male colleagues.[2] Accordingly, we find that Baylets-Holsinger has not set forth a *prima facie* case of gender discrimination.

In addition, Baylets-Holsinger has failed to show that she was subjected to a hostile work environment in violation of Title VII. On this score, the plaintiff seems to be asserting two theories of a hostile work environment claim. First, she asserts a generalized gender-based hostile work environment claim, alleging that her supervisors subjected her to discrimination and harassment because of her gender. She alleges that she was disciplined for behavior that male coworkers were not disciplined for, such as tardiness. (Doc. 66, at 6). Additionally, she claimed that her supervisor had "an intimidating pattern of walking by and peering in the window . . . to verify [her] arrival time." (Id.) Finally, she claims that she was placed on the PIP for discriminatory reasons, as she did not believe there were deficiencies with her work performance. (Id., at 2).

Here, Baylets-Holsinger provides no evidence to show that the actions taken against her were because of her gender. She simply claims that she was treated

---

[2] While the plaintiff purports to set forth other examples of male colleagues getting promoted or having a lesser workload, she provides no evidence whatsoever to support these assertions beyond her subjective beliefs.

differently than some of her male coworkers. However, she stated in her deposition that one of her male coworkers also complained about a heavy workload. (Doc. 63, at 16). In addition, although she alleged that she was disciplined when her male colleagues were not, she conceded in her deposition that she did not know if these individuals were disciplined for an array of behaviors. (Id., at 18). Accordingly, the plaintiff has not shown that she was discriminated against and subjected to a hostile work environment because of her gender.

Baylets-Holsinger also purports to bring a hostile work environment claim based on sexual harassment by a male colleague. She asserts that she and other women in her office were harassed by a male coworker, that she informed management and HR about the harassment, and that nothing was done about it. (Doc. 66, at 2).  However, in her deposition, Baylets-Holsinger admitted that she had never complained of sexual harassment toward herself, but that she had reported the harassment on behalf of other women in her office. (Doc. 63, at 12-13). Indeed, the plaintiff does not provide any evidence showing that she was subjected to sexual harassment from a male coworker. To the contrary, while she gave examples of harassment that other women faced, she stated that the man who allegedly sexually harassed other female employees was merely "offstandish" toward her and refused to help her on a project. (Id., at 14). Thus, because Baylets-Holsinger concedes that she had not been sexually harassed by her male coworker, we cannot conclude that

she was subjected to a hostile work environment because of her gender. See e.g.,

Larochelle v. Wilmac Corp., 210 F.Supp.3d 658, 686 (E.D. Pa. 2016) (finding that

the plaintiff's testimony "that she was never sexually harassed eliminates any

genuine issue of material fact as to her gender-based hostile work environment

claims").

Nonetheless, even if the plaintiff was able to set forth a *prima facie* case of

discrimination or a hostile work environment, Penn State has proffered a well-

supported legitimate, non-discriminatory reason for the disciplinary action taken

against Baylets-Holsinger. On this score, Penn State asserts that Baylets-Holsinger

was subjected to a PIP because of on-going deficiencies in her work performance

and because she had been arriving late to work. Indeed, the PIP plan set forth specific

areas in her work that needed improvement, including contract administration, time

management, and her tardiness. (Doc. 63, at 68-70).

Thus, under the McDonnell Douglas framework the burden then shifts back to the

plaintiff to show that this reason was a pretext for discrimination. Here, we find that

Baylets-Holsinger has simply not met that burden. In her deposition, the plaintiff

admitted that she was, in fact, late to work on occasion. (Id., at 24-25). Additionally,

although Baylets-Holsinger disagrees that her work performance was deficient, she

does not point to any evidence in the record from which we could find that Penn

State's reason for disciplinary action against her was a pretext for gender

discrimination. Rather, as we have noted, she admitted that she was not aware if her male colleagues were disciplined in the same manner that she was disciplined. Further, Penn State has provided declarations of several employees that were involved with Baylets-Holsinger at Penn State, all of whom stated that there were legitimate issues with the plaintiff's work performance. (Doc. 63, at 142-43, 147-48, 151). Additionally, contemporaneous records prepared well before any litigation began thoroughly documented persistent dissatisfaction with Baylets-Holsinger's job performance. Accordingly, we find that there is no genuine issue of material fact with respect to the plaintiff's gender discrimination claim, whether on the basis of generalized gender discrimination or a hostile work environment, and this claim fails as a matter of law.

### B. **The Plaintiff has not Set Forth a Claim for Title VII Retaliation.**

Baylets-Holsinger also brings a claim under Title VII for retaliation. Title VII contains a retaliation provision, under which a plaintiff must show that "(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against h[im]; and (3) there was a causal connection between h[is] participation in the protected activity and the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain

Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Moore, 461 F.3d at 341 (citing Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)). Regardless of the distinction between the two theories of retaliation, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." Id. (citing Clark County v. Breeden, 532 U.S. 268, 271 (2001) (per curiam)).

A plaintiff alleging Title VII retaliation must show that a reasonable employee would have found the allegedly retaliatory action "materially adverse" in that the conduct "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore, 461 F.3d at 341. A plaintiff must also show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have discouraged a reasonable employee from making or supporting a charge of discrimination.  "Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006). This third element "identif[ies] what harassment, if any, a reasonable jury could link to retaliatory animus." Id. at 449-50. "The ultimate question in any retaliation case is an intent to retaliate vel non." Id. at 449 n.2.

As we have explained with respect to the plaintiff's discrimination claims, Title VII claims are subject to the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hare, 220 F. App'x at127. If the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct, and if the employer does so "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (quoting Krouse, 126 F.3d at 500-01).

In the instant case, Baylets-Holsinger alleges two instances of retaliation. First, she claims that she was placed on the PIP about six weeks after she reported Taylor's bullying and harassment to Senior Director Martin. Additionally, she asserts that she was placed on the HR-78 in retaliation for her reporting of a one million dollar overspend. (Doc. 66, at 2, 10). At the outset, we note that Baylets-Holsinger's claim regarding the overspend is not a cognizable claim under Title VII. As we have explained, a plaintiff must have engaged in "protected activity," meaning opposing unlawful discrimination under Title VII or participating in a Title VII proceeding. See Moore, 461 F.3d at 341. Thus, the reporting of what Baylets-Holsinger perceived to be an overspend does not fall into the kind of reporting activity that Title VII protects, and as such, this claim fails as a matter of law.

Baylets-Holsinger's claim of retaliation concerning her report to HR in August of 2015 also fails on several scores. At the outset, we find that Baylets-Holsinger's report to HR in 2015 may not rise to the level of does not satisfy the "protected activity" element of her retaliation claim. There are some fatal ambiguities to this report. The plaintiff alleges that she reported Taylor's harassing and bullying behavior, as well as her concerns of discrimination, to Senior Director Martin, who then set up a meeting with David Daisley and Susan Morse of HR. However, the defendant has provided the declarations of both Daisley and Morse, who assert that Baylets-Holsinger never reported instances of gender discrimination. (Doc. 63, at 146, 160). Rather, Baylets-Holsinger complained of the "climate" in her office and her workload issues, as well as instances of inappropriate behavior by a male coworker toward other women in the office. (Id.) Indeed, in her deposition, Baylets-Holsinger stated that she had mentioned workload issues and instances of her coworkers' sexual harassment experiences, but nothing specifically about discriminatory behavior. (Id., at 18-19). In fact, she characterized her complaints to Martin as "concerns of bullying, overloading, and high stress levels." (Id., at 19). Accordingly, we cannot conclude that the plaintiff's reports to HR concerning her workload and "climate" are sufficient to constitute protected activity under Title VII.

But even if we accepted that Baylets-Holsinger had engaged in protected activity, as we have discussed with respect to the plaintiff's discrimination claim,

being placed on a PIP does not constitute an adverse employment action. <u>See</u> <u>Reynolds</u>,439 F. App'x at 153; <u>Nicholson</u>, 409 F.Supp.3d at 332; <u>Russell</u>, 2019 WL 1277514, at *9. Moreover, Baylets-Holsinger has not shown that there was a casual connection between her alleged protected activity in August 2015 and the placement on a PIP three months later in November 2015. On this score, the Third Circuit has held that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." <u>Leboon v. Lancaster Jewish Community Center Ass'n</u>, 503 F.3d 217, 233 (3d Cir. 2007). In addition, courts consider "intervening antagonism or retaliatory animus," <u>id.</u> at 232, and "look at all 'circumstantial evidence that support[s] the inference' of causation." <u>Harrison-Harper v. Nike Inc.</u>, 788 F. App'x 846, 849 (3d Cir. 2019) (quoting <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280-81 (3d Cir. 2000)).

Here, Baylets-Holsinger complained of workplace issues to HR in August 2015 and was placed on a PIP in November 2015. Thus, without more, the three-month gap between her complaint and being placed on a PIP is insufficient to show a causal connection. Moreover, there is no evidence of intervening antagonism or retaliatory animus. To the contrary, the record indicates that Baylets-Holsinger's complaints were taken seriously by HR. Thus, when the plaintiff made a complaint to Martin, Martin set up a meeting with Daisley and Morse, who conducted an

investigation into the plaintiff's workplace complaints. According to Baylets-Holsinger, their investigation revealed that there was "quite of bit of dysfunction and confusion with reporting lines," after they had spoken with several other staff members. (Doc. 63, at 120). Indeed, Morse's declaration indicates that six employees were interviewed, and the investigation concluded that there was a lack of clarity between Baylets-Holsinger and her supervisors, as well as legitimate concerns regarding inappropriate behavior by a male coworker toward others in the office. (Id., at 147). However, the investigation also revealed issues with Baylets-Holsinger's work performance. (Id., at 147, 161). Thus, there is nothing in the record that indicates any retaliatory animus during the time between Baylets-Holsinger's complaint and her placement on the PIP. Accordingly, we cannot conclude that there is a causal connection between these disparate events, and Baylets-Holsinger has failed to set forth a *prima facie* case of retaliation.

In any event, even if the plaintiff had set forth a *prima facie* case of retaliation, the defendant has asserted a legitimate, nonretaliatory reason for Baylets-Holsinger's placement on a PIP. As we have stated, Penn State avers that there were legitimate concerns with Baylets-Holsinger's work performance, specifically with respect to her time management, contract administration, and tardiness. These concerns were memorialized on multiple occasions over time in the investigation into Baylets-Holsinger's complaints, the PIP process, and the HR-78. Further, Penn

State has provided declarations of several employees that were involved with Baylets-Holsinger at Penn State, all of whom stated that there were legitimate issues with the plaintiff's work performance. (Doc. 63, at 142-43, 147-48, 151).

Baylets-Holsinger has not provided any evidence to show that this legitimate reason was a pretext for retaliation other than her own subjective belief that the action was retaliatory. She merely contends that she did not believe her work performance was deficient, and that the real reason for the PIP placement was retaliation for her complaints. This is simply not enough from which a factfinder could conclude that Penn State's legitimate reason was pretext for retaliation. See Ekhato v. Rite Aid Corp., 529 F. App'x 152, 156 (3d Cir. 2013) (finding the plaintiff's subjective belief of pretext insufficient to defeat a motion for summary judgment); see also Sawl v. Shulkin, 2018 WL 4501061, at *12 (W.D. Pa. Aug. 27, 2018); Didier v. Dow Jones Co., Inc., 2014 WL 4094920, at *16 (D.N.J. Aug. 18, 2014) (same). Accordingly, Baylets-Holsinger's retaliation claim fails as a matter of law, and the defendant's motion for summary judgment will be granted.[3]

---

[3] In reaching this result, we note that we do not question the subjective sincerity of the plaintiff, a *pro se* litigant, who believes that he former employer did not fairly evaluate and value her work. We simply note that federal civil rights lawsuits must rest upon more than subjective sincerity, or a personal, generalized sense of grievance.  They must rely upon facts which meet the elements of a cause of action under specific statutes. After more than two years of litigation we conclude that these claims do not satisfy these legal requisites. Therefore, this complaint must be dismissed.

V.     **CONCLUSION**

Accordingly, for the foregoing reasons, the defendant's motion for summary

judgment (Doc. 61) will be GRANTED. An appropriate order follows.

> */s/ Martin C. Carlson*
> Martin C. Carlson
> United States Magistrate Judge